IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TERESA D. BROWN,                )
                                )
              Plaintiff,        )
                                )
      v.                        )    Case No.
                                )    05-1163-CV-W-REL-SSA
JO ANNE BARNHART, Commissioner  )
of Social Security,             )
                                )
              Defendant.        )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Teresa Brown seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles
II and XVI of the Social Security Act ("the Act").
Plaintiff argues that (1) the ALJ erred in failing to give
controlling weight to plaintiff's treating physician, Dr.
Laurie Fisher; (2) the ALJ erred in finding that plaintiff
could return to her past relevant work as a receptionist;
(3) the ALJ erred in failing to account in the Residual
Functional Capacity for plaintiff's moderate mental
impairment; (4) the ALJ improperly substituted his own
opinion in place of the treating physician; and (5) the ALJ
erred in finding plaintiff's depression not a severe
impairment.  I find that the substantial evidence in the
record as a whole supports the ALJ's determination that

plaintiff can return to her past relevant work as a receptionist and is therefore not disabled. As a result, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On August 27, 2003, plaintiff applied for disability benefits alleging that she had been disabled since May 22, 2003. Plaintiff's disability stems from back and neck problems, depression, and memory and concentration problems. Plaintiff's application was denied on December 22, 2003. On June 6, 2005, a hearing was held before an Administrative Law Judge. On August 10, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 4, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401

2

(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have

3

supported an opposite decision."  Id.; Clarke v. Bowen, 843
F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the
burden of proving she is unable to return to past relevant
work by reason of a medically-determinable physical or
mental impairment which has lasted or can be expected to
last for a continuous period of not less than twelve months.
42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that
she is unable to return to past relevant work because of the
disability, the burden of persuasion shifts to the
Commissioner to establish that there is some other type of
substantial gainful activity in the national economy that
the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled.  These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

4

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. *THE RECORD*

The record consists of the testimony of plaintiff in addition to documentary evidence admitted at the hearing.

## A. EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1970 through 2005, shown in actual and indexed earnings:

| Year | Actual Earnings | Indexed Earnings |
|------|----------------:|-----------------:|
| 1970 | $    450.55 | $ 2,397.74 |
| 1971 | 8.00 | 40.54 |
| 1972 | 0.00 | 0.00 |
| 1973 | 242.46 | 1,053.04 |
| 1974 | 10.73 | 43.99 |
| 1975 | 0.00 | 0.00 |
| 1976 | 0.00 | 0.00 |
| 1977 | 0.00 | 0.00 |
| 1978 | 0.00 | 0.00 |
| 1979 | 0.00 | 0.00 |
| 1980 | 502.78 | 1,322.77 |
| 1981 | 7,931.56 | 18,958.85 |
| 1982 | 1,967.44 | 4,457.39 |
| 1983 | 4,678.84 | 10,107.88 |
| 1984 | 8,801.37 | 17,958.27 |
| 1985 | 4,501.21 | 8,808.94 |
| 1986 | 5,961.02 | 11,329.54 |
| 1987 | 11,432.06 | 20,425.21 |
| 1988 | 12,666.45 | 21,568.38 |
| 1989 | 14,789.73 | 24,224.74 |
| 1990 | 19,471.19 | 30,484.57 |
| 1991 | 17,859.26 | 26,956.35 |
| 1992 | 16,913.42 | 24,277.83 |
| 1993 | 15,339.05 | 21,830.21 |
| 1994 | 13,137.31 | 18,208.74 |

6

|      |           |           |
|------|-----------|-----------|
| 1995 | 18,235.95 | 24,300.61 |
| 1996 | 18,727.62 | 23,792.22 |
| 1997 | 22,834.64 | 27,410.49 |
| 1998 | 23,458.42 | 26,758.76 |
| 1999 | 24,210.95 | 26,159.34 |
| 2000 | 29,246.11 | 29,943.82 |
| 2001 | 34,692.44 | 34,692.44 |
| 2002 | 35,690.08 | 35,690.08 |
| 2003 | 13,098.91 | 13,098.91 |
| 2004 | 0.00      | 0.00      |
| 2005 | 0.00      | 0.00      |

(Tr. at 49-50).

**B.    *SUMMARY OF MEDICAL RECORDS***

On February 1, 2000, plaintiff saw Perry Culver, M.D., at Mid-America Gastro-Intestinal Consultants (Tr. at 109-111).  He noted that plaintiff "does have a problem with mild anxiety and depression."  Plaintiff does not smoke and drinks only modest amounts of alcohol occasionally.  "She is currently separated and is working as an executive administrative assistant.  She has three young adult children as noted above who are all in good health."  Plaintiff reported mild persistent fatigue symptoms, history of mild panic attacks and anxiety, and depression.  "She does have a history of upper back pain and possibly

7

arthritis.  She has had a history of migraine headaches as well."  Dr. Culver performed a physical exam.  His impression was chronic constipation with abdominal bloating, and history of hepatitis with question of possible hepatitis C currently with normal liver function tests by her report. He recommended fiber supplements and a hepatitis profile to make sure she did not have active hepatitis B or C.

On February 29, 2000, plaintiff saw Thomas Wilkins, M.D., after a cat bit her hand (Tr. at 93).  She also requested medicine to help with her nerves.  "She is on Prozac and seems to be fairly stable but a[t] times she feels extremely anxious."  Dr. Wilkins prescribed Ativan.

On August 8, 2001, plaintiff saw Mark Malley, M.D., at Imaging for Women for a bone density measurement (Tr. at 107).  Dr. Malley's impression was moderately severe osteopenia[1]/low bone mass with findings most prominent in the lumbar spine.  He recommended a follow up exam in one to two years.

On March 12, 2002, plaintiff saw Christine Boylan, M.D., for an annual physical exam (Tr. at 124).  "She is

_____

[1]Osteopenia refers to bone mineral density that is lower than normal peak but not low enough to be classified as osteoporosis.

8

doing very well at this time." Plaintiff reported a history of depression and was on Prozac. "She has some concern about her depression. She has been on Prozac for quite some time and she feels that every time her depression gets out of control she starts becoming more and more tired. This has been happening to her recently. However, her moods are still good. Otherwise, she has no complaints." Plaintiff was working as an administrative assistant. She was single and planning her wedding for the following month. "She avoids tobacco and alcohol, exercises regularly." Dr. Boylan wrote, "I would like to see her back in 3 or 4 months. At that time we will be able to reassess her depression. I am hesitant to change any of her medications at this time with her wedding so imminent. I would certainly hate to have any problems occur shortly before her wedding."

On May 3, 2002, plaintiff returned to see Dr. Boylan with complaints of low back pain and pelvic pain (Tr. at 127). "She fell on Wednesday morning that would be May 1st. She was walking out through her deck and the dog pulled her and slipped and fell. She felt okay the first day. However, she has been developing some right hip pain with stiffness down the back of her right thigh and low back pain

9

over the past several days." Plaintiff reported no pain below the knee, and said her pain was worse after sitting for a while or if she was driving and using her right leg. Her range of motion of her back was within normal limits in flexion, extension, and lateral rotation. Straight leg raises were negative for radicular pain. Range of motion of the right hip was within normal limits, but plaintiff had pain with external rotation. Dr. Boylan referred plaintiff for x-rays and prescribed Celebrex.

On May 9, 2002, plaintiff called Dr. Boylan's office (Tr. at 129). "MRI a couple years ago showed herniated disc and arthritis. How can lumbar spine x-ray be normal? Also wants to see a D.O., is this OK?" The notes indicate that plaintiff was to schedule an appointment "with old records".

On May 10, 2002, plaintiff saw Stacey Morgan, D.O. (Tr. at 130). "Teresa is a new patient, . . . who has had problems with right-sided hip pain. . . After initially establishing care with Dr. Boylan, the patient actually preferred to see an osteopathic physician so that she may have some manipulation done. She is here for a consultation today regarding discussing her problems and possible plan. She has had ongoing problem since delivering a 10 pounds 15 ounce baby vaginally. She has had continued right hip pain

10

since then.  She has had MRI and bone density done in the past.  Her MRI has been both of the cervical and lumbar region.  She has history of problems at the L5-S1 region. She recently had x-rays performed, ordered by Dr. Boylan and these showed spondylolisthesis[2] and spondylolysis[3] at L5-S1. She was told she had decreased bone density as well.  I had asked the patient to provide all of her medical records with her today, so that we may go through them and get a better idea of actually what was going on, but she had not done that today.  Her pain seems to be exacerbated recently times the past month or two.  She would like to try osteopathic manipulation before trying physical therapy."  Dr. Morgan instructed plaintiff to get all of her MRIs and bone densities and any further office records or consultations and return.

On May 15, 2002, plaintiff returned to see Dr. Morgan for a follow up on chronic back pain (Tr. at 131). Plaintiff brought copies of her MRI report of the lumbar

---

[2]Spondylolisthesis is a descriptive term referring to slippage (usually forward) of a vertebra and the spine above it relative to the vertebra below.

[3]Spondylolysis is a defect in the pars interarticularis of a vertebra.  The pars interarticularis is a posterior inferior extension of the vertebra that has facets to articulate with the vertebra below it.

spine of July 30, 1999, revealing left-sided L5, S1 nerve
root impingement with first degree spondylolisthesis at L5
and S1. "Questionable evidence of pars defect of the L5
vertebra." She also brought her July 30, 1999, MRI of the
cervical spine which revealed posterior bulging, mild to
moderate foraminal stenosis [narrowing of the spinal canal
through which the nerve roots pass] at the C4-5 and C5-6
level. "No evidence of spinal cord compression. Posterior
bulge is noted to abut, but not compress the cord. . . .
Bone density of 08/08/2001 reveals moderately severe
osteopenia[4] most prominent in the lumbar spine." Dr. Morgan
noted asymmetry in the iliac crest [the very outer edges of
the pelvic "girdle"], decreased cervical range of motion,
and cervical muscle tenderness. Lower extremity strength
was appropriate, and straight leg raising was negative. Dr.
Morgan assessed lumbar and cervical degenerative disk
disease, degenerative spine disease and osteopenia. She
prescribed osteopathic manipulation[5] every one to two weeks

_____

[4]Osteopenia refers to bone mineral density that is
lower than normal peak but not low enough to be classified
as osteoporosis.

[5]The osteopathic physician moves the patient's muscles
and joints using techniques including stretching, gentle
pressure, and resistance.

Case 4:05-cv-01163-REL   Document 12   Filed 01/04/07   Page 12 of 74

as needed.

On May 22, 2002, plaintiff saw Dr. Morgan for her
second round of osteopathic manipulation (Tr. at 132). "OMT
[osteopathic manipulation therapy] was mildly helpful last
time, minimally and she has had minimal improvement."
Plaintiff was instructed to return in two weeks for
additional treatment.

On June 5, 2002, plaintiff saw Dr. Morgan for a follow
up (Tr. at 133). Plaintiff reported that the previous
manipulation made her right hip and leg worse for a few
days, then after the first week her pain was approximately
the same as before treatment. Plaintiff had decreased
cervical range of motion in side bending and rotation to the
left as well as extension. "She ambulates without
difficulty. She manipulates herself onto the exam table
without difficulty." Straight leg raising was positive on
the right, equivocal on the left. "We will hold off on
osteopathic manipulation since she feels like it actually
made her worse. Additionally, I have referred her to pain
management referral, and hopefully they will refer her to
physical therapy as well, but I will refer her to physical
therapy if they do not do so."

On June 14, 2002, plaintiff saw James Scowcroft, M.D., at North Kansas City Hospital for pain management, at the request of Dr. Stacy Morgan (Tr. at 169-170).  Plaintiff's chief complaint was lower back and right leg pain. Plaintiff reported seven weeks of back pain and right leg pain following a fall off of the steps.  She said the pain was typically aggravated by activity, especially if she is driving after a long day at work.  "It improves if she lies down."  Dr. Scowcroft performed a physical exam and found that plaintiff had full range of motion in her lower extremities.  He assessed lumbar radiculitis[6] and myofascial pain syndrome[7].  Dr. Scowcroft recommended a series of

---

[6]Inflammation of a spinal nerve root.

[7]Myofascial Pain Syndrome (or MPS) is a term used to describe one of the conditions characterized by chronic pain. The term may be a misnomer, since there is no evidence that there is any abnormality of the muscles or fascia. It is associated with and characterized by "trigger points", sensitive and painful areas between the muscle and fascia. The symptoms can range from referred pain through myofascial trigger points to specific pains in other areas of the body. The MPS is probably closely related to a better characterized condition known as the Fibromyalgia Syndrome. The principal difference between the two conditions seems to be the distribution of the reported pain. By accepted definition, the pain of Fibromyalgia is generalized, occurring above and below the waist and on both sides of the body. On the other hand, myofascial pain is more often described as occurring in a more limited area of the body, for example, only around the shoulder and neck, and on only one side of the body.

lumbar epidural steroid injections and possibly a course of physical therapy following the injections. He gave plaintiff her first injection that day.

On June 21, 2002, plaintiff returned to see Dr. Scowcroft (Tr. at 173). He noted that she had undergone one epidural steroid injection "with good improvement." Plaintiff had her second injection that day.

On September 17, 2002, plaintiff saw Dr. Morgan (Tr. at 134). Plaintiff's cervical range of motion was decreased in side bending bilaterally, worse to the left than to the right. Rotation was slightly inhibited. Extension and flexion were full. Dr. Morgan performed occipital release [putting pressure on the back of the head]. Functional and counter strain[8] was also performed "with approximately 60-70% improvement." Dr. Morgan assessed occipital/cervical muscular strain/tenderness and muscle tension. She gave

---

[8]The patient is put in a comfortable position for approximately 90 seconds. During this time the patient's muscles will naturally reset to their proper positions. Once the muscles are in their natural position, the strain/counter strain treatment is applied by the practitioner, who gently stretches the injured muscle in its natural position; while at the same time shortening the dysfunctional tender point so that it becomes rebalanced with the rest of the body. When the original position is resumed, the muscles are now realigned in their natural position and the pain should disappear.

15

plaintiff some samples of Skelaxin, a muscle relaxer, and recommended she come back in three to six days for further manipulation.

On September 20, 2002, plaintiff returned to see Dr. Morgan (Tr. at 135). Plaintiff reported that she was moving and turning her head a little bit easier. Dr. Morgan performed osteopathic manipulation.

On October 1, 2002, plaintiff returned to see Dr. Morgan. "She is feeling much better today since her last treatment. Her cervical range of motion is better. She has been working on her posture as well." Dr. Morgan performed osteopathic manipulation.

On February 14, 2003, plaintiff telephoned Dr. Morgan's office and requested a referral for physical therapy (Tr. at 139).

On March 4, 2003, plaintiff saw Dr. Morgan for back and shoulder pain (Tr. at 140). Plaintiff said she had been painting and experienced increased pain. Dr. Morgan assessed muscle spasm and recommended stretches for plaintiff's back.

On March 18, 2003, plaintiff returned to see Dr. Morgan complaining of worsening numbness in her left leg (Tr. at 141). She also complained of memory trouble and said she

16

was using diet pills.  Dr. Morgan recommended an MRI of plaintiff's brain, and told plaintiff to stop taking the Metabolife diet pills.

On April 8, 2003, plaintiff was seen at Headache and Pain in Leawood, Kansas (Tr. at 176-180).  She reported increased pain, like a "catch" in her low back, since her injection, as well as increased pain in her left buttock. She was given a prescription for Vioxx (a non-steroidal anti-inflammatory) and Zanaflex (a muscle relaxer).

On April 11, 2003, plaintiff returned to Headache and Pain in Leawood and reported that her pain was worse than before she got her injections (Tr. at 181).  The examiner noted that plaintiff's mood and affect were appropriate.

On April 17, 2003, plaintiff returned to Headache and Pain in Leawood (Tr. at 181, 183).  She reported pain near her base line.  The records reflect that plaintiff's mood and affect were appropriate.  "Please order PT [physical therapy] – pt [patient] refuses."  The records reflect that "Pt will decide in 2 weeks if she wants PT eval[uation]".

On April 29, 2003, plaintiff saw Lisa Hermes, M.D., at the Headache and Pain Center (Tr. at 184-188).  Plaintiff's mood and affect were appropriate.  Portions of Dr. Hermes's records read as follows:

17

**HISTORY OF PRESENT ILLNESS:** Teresa presents with a chief complaint of pain and numbness of the upper and lower extremities. The patient has also had some right lower facial pain on occasion. Onset of symptoms was in December of 2002 and the symptoms have become progressively more severe in the ensuing period. The patient notes the symptoms to be constantly present and vary in intensity. She complains of numbness of both hands extending up the volar and medial aspect of the arm and into the elbow, also some neck pain and pain across the upper back more notable on the right side.

\* \* \* \* \*

**PHYSICAL EXAMINATION:** . . . There was no atrophy or fasciculation [muscle twitch] of the upper or lower extremity musculature. Tinel's sign[9] was negative over the median nerve of the wrist, ulnar nerve at Guyon's canal, cubital tunnel, and over the radial tunnel. Pinch and Froment's signs[10] were negative as well. Cranial nerves II-XII were grossly intact. There is no supraclavicular adenopathy. No evidence of synovitis or limitations of major joint motion. No scapular winging. Deep tendon reflexes were 1+-2+ and symmetrical. Coordination appeared to be functional as well.

---

[9]Tinel's sign is a way to detect irritated nerves. It is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve.

[10]Froment's sign tests for palsy of the ulnar nerve, specifically, the action of adductor pollicis. To perform the test, a patient is asked to hold an object, usually a piece of paper, between the thumb and a flat palm. The object is then is pulled away. A normal individual will be able to maintain a hold the object without difficulty. However, with ulnar nerve palsy, the patient will experience difficultly maintaining a hold and will compensate by flexing the FPL [a tendon] of the thumb.

18

Dr. Hermes performed nerve conduction studies and an electromyographic examination. She found no evidence of entrapment or peripheral neuropathy, myopathy, brachial plexopathy or cervical radiculopathy to explain plaintiff's symptoms. She recommended an MRI of the cervical spine and follow up with Pain Management as scheduled.

On May 1, 2003, plaintiff saw Milton Landers, D.O., at the Headache and Pain Center (Tr. at 189-190, 192-193). Dr. Landers performed a lumbar myelogram. His impression was "essentially normal lumbar myelogram with incidental left dural root sleeve at L5." He had observed a cyst at that location. Plaintiff also had a cervical myelogram. Dr. Landers's impression was "Minimal-to-moderate compression of the ventral thecal sac at C5-6, otherwise normal cervical myelogram." Plaintiff also had a CT scan of her cervical spine and lumbar spine performed by John Eurich, M.D. Dr. Eurich found that plaintiff had "significant discogenic disease of the mid and lower cervical spine with complete effacement [thinning] of the CSF [cerebrospinal fluid] and mild to moderate central stenosis [narrowing] but no significant flattening of the cervical cord. There are uncovertebral changes and hypertrophy [increase in bulk] of the facets with minimal to mild narrowing of a few of the

19

neural foramina [the opening through which the nerve passes]".  With respect to the lumbar spine, he found "discogenic disease of the lumbar spine without significant central stenosis [narrowing].  There is hypertrophy [increase in bulk] of the facets and ligamentum flavum[11] at multiple levels, however at L5-S1 there is a diffuse posterior disc osteophytic ridge eccentric to the left with loss of perineural fat around the exiting nerve root on the left.  [There is] some loss of contrast within the perineural sleeve suggesting mild impingement on the intraforaminal course of the exiting nerve roots on the left at this level.  Clinical correlation is suggested."

On May 2, 2003, plaintiff was seen at the Headache and Pain Center (Tr. at 198).  She complained of numbness in all of her fingers bilaterally since December 2002.  She said she gets spasms in her hands and drops things.  She complained of jumpiness in her legs, numbness in her feet, and low back pain radiating into both legs.  Most of the record is illegible.  I can make out "PE genl WNL" which I interpret as "physical exam generally within normal limits".  It appears that the record noted some of the results of

---

[11]A band of elastic tissue which assists in maintaining or regaining the erect position.

plaintiff's tests from the day before.

On May 6, 2003, plaintiff was seen at the Headache and Pain Center (Tr. at 199-201). Milton Landers, D.O., gave plaintiff an epidural blood patch[12] after she was diagnosed with post dural puncture headache.

On May 7, 2003, plaintiff called Dr. Landers's office and stated that she still had a headache, but it was a different kind of headache from the one she had before the blood patch (Tr. at 202). Dr. Landers believed, based on plaintiff's description of her pain, that the headache was a general headache and not a post blood patch headache.

May 22, 2003, is plaintiff's alleged onset date.

On August 13, 2003, plaintiff returned to see Dr. Morgan (Tr. at 148). Dr. Morgan noted that plaintiff

---

[12]An epidural blood patch is an injection of the patient's blood into the epidural space. The epidural space is not an injection into the spinal cord itself. The spinal cord and spinal nerves are in a "sack" containing clear fluid (cerebrospinal fluid). The area outside this "sack" is called the epidural space. There are certain conditions under which patients will have had injections in the spinal column. Examples include an epidural during labor, a diagnostic spinal tap, a therapeutic spinal injection, etc. A small number of patients will experience a severe headache after the procedure, usually worse with standing and better when lying down. This is due to a persistent leak of spinal fluid into the epidural space. The injection of a freshly drawn sample of the patient's own blood into the epidural space "plugs the leak" and the headache goes away.

21

appeared anxious and depressed.  She had diminished range of motion in her neck.  Dr. Morgan assessed cervical and lumbar radiculopathy[13], memory loss, and depression.  She started plaintiff on Paxil and recommended plaintiff see a neurosurgeon.

On August 27, 2003, plaintiff applied for disability benefits.

On September 15, 2003, plaintiff saw Jonathan Chilton, M.D., at Midwest Neurosurgery Associates at the request of Dr. Stacey Morgan (Tr. at 203-205).  Her chief complaint was low back and leg pain.  Portions of those records are repeated below:

> **History of present illness:**  . . .  She complains of bilateral hip and leg pain which began in her early 20's and has been more severe over the last ten years. She complains of a "tightness" in the low back associated with an indescript pain in the right posterior lateral thigh, calf, and foot.  She complains of tightness in the calf and heel and occasional discomfort in the groin.  She complains of tingling, numbness, and an almost burning discomfort in the thigh, calf, and little toe of the right foot.  She experiences similar symptoms in the left leg which are less frequent and severe.  All of the aforementioned symptoms are intermittent and vary in frequency and severity.  The back and leg pain is increased with standing, walking, bending, sweeping, and bicycle riding.  She is able to get temporary relief with chiropractic, osteopathic manipulation, and muscle

---

[13]Nerve irritation caused by damage to the discs between the vertebrae.

relaxers.  She reports transient improvement in leg
symptoms following two epidural steroid injections on
separate occasions.

She complains of a 40 year history of neck pain
described as "tightness with decreased flexibility"
which is associated with periodic episodes of
alternating hemicrania [a type of a headache]. . . .
She complains of decreased range of motion and pain in
the right shoulder with an indescript discomfort and
stiffness in the right elbow and hand without specific
complaints of radiating upper extremity pain.  The
symptoms are described as a "want to make it pop"
discomfort.  She complaints of numbness, tingling, and
weakness in the right hand.  All of the symptoms are
intermittent and vary in intensity and severity.  She
is unable to identify any specific aggravating or
alleviating factors.  She denies clumsiness of her
hands. . . .

**Medications:**  Thyroid, Flexeril [a muscle relaxer]
p.r.n. [as needed], ibuprofen [non-steroidal anti-
inflammatory] p.r.n. [as needed].

. . .  **Social history**.  She quit work, as an
administrative assistant six months ago due to
increasing complaints of neck pain.  She reports
significant relief of symptoms since [she] stopped
working.

**Physical examination:**  . . .  Straight-leg raising to
80 degrees on the right causes a "pulling" sensation in
the hamstring.  Straight-leg raising is negative to 80
degrees on the left.  She has tenderness to palpation
over the paracervical and trapezius muscles
bilaterally.  She has full range of head and neck
motion without significant pain. . . .  Sensory
examination reveals patchy sensory loss to pin in the
right distal leg involving L5 and S1 distributions and
patchy sensory loss in the upper extremities most
prominent in the right index finger.  The sensory
examination did not seem to be very reliable. . . .
She is able to heel walk, toe walk, and tandem gait
without difficulty.

23

**Radiographic findings:** I reviewed the MRI scan of the cervical spine obtained on 5/2/03 and CT myelogram of the cervical spine obtained on 5/1/03. . . . I reviewed the post-myelogram CT scan of the lumbar spine obtained on 5/1/03. . . .

**Impression:**
1. Chronic relapsing back and right greater than left leg pain.
2. Chronic relapsing neck and right upper extremity pain.
3. Mild to moderate multilevel cervical stenosis[14].
4. L5 spondylolysis[15] with spondylolisthesis[16].

---

[14]The cervical spine (neck) is made up of a series of connected bones called vertebrae. The bones protect the spinal canal that runs through the vertebrae and carries the spinal cord. The spinal cord contains nerves that give strength and sensation to the arms and legs, and provide bowel and bladder control. Numerous connections (discs, joints, ligaments and muscles) between the cervical vertebrae provide support and stability, and allow motion. With age, intervertebral discs become less spongy and lose water content. This can lead to reduced disc height and bulging of the hardened disc into the spinal canal. The bones and ligaments of the spinal joints thicken and enlarge, also pushing into the spinal canal. These changes are common after age 50 and are generally called "cervical spondylosis" or "cervical stenosis." Cervical stenosis may occur at a very slow or very fast rate. These changes cause narrowing of the spinal canal and can pinch the spinal cord and nerve roots. Spinal cord or nerve function may be affected, causing symptoms of cervical radiculopathy or myelopathy. (Cervical stenosis is the name for the actual narrowing of the canal, while cervical myelopathy indicates injury to the spinal cord and its function.)

[15]Spondylolysis is a defect in the pars interarticularis of a vertebra. The pars interarticularis is a posterior inferior extension of the vertebra that has facets to articulate with the vertebra below it.

[16]Spondylolisthesis is a descriptive term referring to slippage (usually forward) of a vertebra and the spine above

**Recommendations:**
1.   I reviewed the option for L5 nerve root
     decompression and L5-S1 fusion for isthmic
     spondylolisthesis. . . .  I informed her that
     isthmic spondylolisthesis was frequently an
     asymptomatic finding and complaints of back and/or
     leg pain may persist despite an adequate
     decompression and fusion.
2.   . . .  It is unlikely that she would enjoy
     significant relief of neck pain and headaches
     following surgical intervention for neck symptoms
     which are not her primary complaint at this time.
     I recommended observation and symptomatic
     management, and suggested that she progress with
     activities as tolerated. . . .

On September 18, 2003, plaintiff had a bone density

test done by Linda Harrison, M.D., at Diagnostic Imaging

Centers (Tr. at 151-152).  Dr. Harrison found osteopenia[17]

in the lumbar spine with lower limits of normal bone density

in the hips.

On September 22, 2003, plaintiff returned to see Dr.

Morgan for back problems (Tr. at 160).  She reported that

she had seen Dr. Chilton who did not believe surgery was

warranted on plaintiff's neck.  Dr. Morgan noted that

plaintiff appeared anxious.  She diagnosed cervical

radiculopathy, shoulder pain, lumbar radiculopathy, and

─────────────────────

it relative to the vertebra below.

     [17]Osteopenia refers to bone mineral density that is
lower than normal peak but not low enough to be classified
as osteoporosis.

anxiety, and she increased plaintiff's Paxil dosage.

On October 14, 2003, Disability Determinations received an undated, unsigned form from Dr. Morgan (Tr. at 166). The form asked for plaintiff's range of motion in her back. Dr. Morgan wrote, "decreased 20-50%". The forms asked, "What is the current treatment and when was it initiated?" and Dr. Morgan wrote, "Pt [patient] has had osteopathic manipulation, physical therapy & epidural injections within the last 3-5 years. She has been treated with pain medication & muscle relaxers, currently." The form asked Dr. Morgan to "Described in detail, any neurological abnormality (sensory, motor or reflex abnormalities, muscle atrophy, muscle spasm, or muscle tenderness)" and she wrote, "low back muscle spasm, numbness & pain radiating to legs, altered reflexes lower extremities, weakness lower extremities". The form asked Dr. Morgan to "Describe any evidence of a mental problem which impacts the patient's ability to perform basic tasks and make decisions required for daily living", and Dr. Morgan wrote, "poor concentration & anxiety [secondary] to pain & difficulty functioning".

On November 24, 2003, plaintiff saw Dr. Morgan for neck and back pain and said she was unable to work (Tr. at 258). Dr. Morgan diagnosed cervical radiculopathy and neck and

26

back pain.  The treatment is illegible, but appears to be
multiple types of "release".

On December 9, 2003, plaintiff saw Robert Pulcher,
Ph.D., a psychologist, for a psychological evaluation (Tr.
at 207-210).  Portions of Dr. Pulcher's report read as
follows:

> **Reason for Referral:**  Teresa Brown was referred for
> psychological testing and consultation to help
> determine eligibility to receive SSD benefits. . . .
>
> **Observational Data:**  Teresa . . . arrived on time for
> the appointment.  She was driven to the office by her
> husband, and produced a valid driver's license as
> picture ID.  She does drive, but only on short trips. .
> . .  No gait or posture problems were noted. . . .  She
> sat throughout the almost two hour appointment without
> noted discomfort. . . .
>
> **Tests Administered:**
>     Individual Psychological Consultation (Brief)
>     Trail Making Test
>     Wechsler Memory Scale III (WMS-III)
>
> **Mental Status:**  . . .  She presents a normal affect
> with a relaxed, calm mood. . . .  Focus was on her
> physical problems, which she reports have caused
> unemployment and depression. . . .  [S]he reported
> having trouble concentrating, making decisions,
> following instructions, and being confused.  She
> reported trouble listening to others and always losing
> or misplacing items she needs.  She is restless and
> always needing to be doing something.  Teresa reports
> poor sleep patterns and that she has difficulty falling
> asleep and always wakes in the middles of the night. .
> . .
>
> **Medical History:**  . . .  She reports having hurt her
> back and went to an Osteopath for the pain and
> headaches 40 years ago.  She reports pain has gotten

27

worse in the past 10 years, and two surgeons have
wanted to do surgeries on her neck and lower spine. . .
She brought the following medications to the
appointment:

    Zanaflex[18] 4 mg (filled 4-8-03)
    Paxil CR[19] 25 mg (filled 10-15-03)
    Lexapro[20] 10 mg (filled 11-11-03)
    Florosemide[21] 20 mg (filled 11-20-03)
    Thyroid 120 mg (filled 11-12-03)
    Cyclobenzaprine[22] 10 mg (filled 12-04-03)

**Summary of Test Results:**  On the Trail Making Test Part
A Teresa completed all items without error in 28
seconds.  This places her with the NORMAL RANGE of
psychoneurological functioning.  On Part B, which is
more difficult . . . [she was] within the PERFECTLY
NORMAL RANGE of psychoneurological functioning.

On the WMS-III Teresa received the following Index
Scores:

| | |
|---|---|
| Auditory Immediate | 80 |
| Visual immediate | 94 |
| Immediate Memory | 84 |
| Auditory Delayed | 92 |
| Visual Delayed | 100 |
| Auditory Recognition Delayed | 90 |
| General Memory | 92 |
| Working Memory | 99 |

---

[18]Zanaflex is a muscle relaxer.

[19]Paxil CR is a selective serotonin reuptake inhibitor
used to treat depression and anxiety, among other things.

[20]Lexapro is a selective serotonin reuptake inhibitor
used to treat depression and anxiety, among other things.

[21]I have found no information on a drug called
Florosemide.  However, Furosemide is a diuretic, used to
reduce swelling in the body or for high blood pressure.

[22]Cyclobenzaprine is a muscle relaxer.

28

. . . On this particular test instrument an Index Score ranging from 90 through 110 is considered Average for memory function. It will be noted that Teresa's Index Scores, which ranged from 80 through 100, on the Percent of cases under portions of the normal curve place her from the bottom of Low Average to the middle of Average. This indicates she has some areas of memory loss, but not to a profound degree.

Her Index score of 13 on the Family Pictures I Recall, Visual, which deals with immediate memory, corresponds with her Index score of 14 on the same category in the Delayed Memory. Both of these tasks involve visual skills related to memory of pictures, and would indicate no great difference between Immediate and Delayed memory skills. Again her Index score of 5, which is low, on the Faces I Recognition Immediate, Visual, corresponds with her Index score of 6 on the Faces II Recognition Delayed. Her memory skill on both these tasks was similar. Her ability to handle auditory tasks, where the examiner gave instructions verbally, appeared to be the most affected, but even this was not of a profound nature.

**Conclusion:** Teresa gives evidence of some mild depression and reportedly is taking medication for it. This examiner does not believe she has a Major Depressive Disorder at this time. Her memory loss, as shown on the WMS-III is not profound. She does have areas where she is less able to remember things, such as when verbal information is given to her as opposed to visual. The results of the WMS-III would not indicate a person who is unable to handle employment where she is familiar with the work, and where tasks are clear and supervision is provided. Her work experience as a secretary and receptionist should be within her ability to function as shown on the WMS-III and Trail Making Tests. However her physical condition should merit more attention, with possible correction through either physical therapy or surgery. At least some part-time employment might help her to better live with the chronic pain she reports.

29

**Diagnosis:**

```
Axis I     Depressive Disorder NOS [not otherwise
           specified] (Addressed in the allegations,
           reportedly treated with medication)
Axis II    Mild Memory Loss, as shown on the WMS-III
Axis III   Back problems alleged, Osteopenia, Migraine
           Headaches, previously diagnosed.
Axis IV    Unemployment since March 2003
Axis V     65[23]
```

On that same day, Dr. Pulcher completed a brief form asking for plaintiff's maximum ability to understand and remember instructions, sustain concentration and persistence in tasks, and interact socially and adapt to her environment (Tr. at 211). Dr. Pulcher wrote, "This patient's main concerns that affect her social and work life relate to the excessive pain she is trying to deal with." He then referred the reader to his report, partially quoted above.

On December 16, 2003, J. Scott Morrison, M.D., completed a Psychiatric Review Technique (Tr. at 215-232). Dr. Morrison found that plaintiff suffers from organic mental disorders (memory impairment and disturbance in mood) and affective disorders (depressive disorder). He found that plaintiff suffers from moderate restriction of

---

[23]A Global Assessment of Functioning of 65 means some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Case 4:05-cv-01163-REL   Document 12   Filed 01/04/07   Page 30 of 74

activities of daily living, but "primarily for physical reasons". He found that she has mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and that there is insufficient evidence of repeated episodes of decompensation.

That same day, Dr. Morrison completed a Mental Residual Functional Capacity Assessment (Tr. at 229-231). Dr. Morrison found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

31

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Dr. Morrison found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

In support of his findings, Dr. Morrison wrote the
following:

> . . . There were no pertinent MERs [medical records]
> regarding the memory allegations, so she was sent for a
> Psych CE [consultative exam] with Robert Pulcher, PhD,
> who did a brief psychological consultation and
> administered a Trail Making Test and a Wechsler Memory
> Scale-III. The Trail Making Test was within normal
> limits.  On the WMS-III there were mild deficits but
> the overall assessment was that her ability fell in the
> **Low Average Range**.  Dr. Pulcher says, "This indicates
> she has some areas of memory loss, but not to a
> profound degree." . . .  Dr. Pulcher states, "The
> results of the WMS-III would not indicate a person who
> is unable to handle employment where she is familiar
> with the work, and where tasks are clear and
> supervision provided.  Her work experience as a
> secretary and receptionist should be within her ability
> to function as shown on the WMS-III and Trail Making
> Tests." . . .  Given these data, it is reasonable to
> conclude that the claimant would be capable of
> performing adequately in a work-like setting,
> particularly if the conditions mentioned by Dr. Pulcher
> were being met.

On December 17, 2003, Lana Minnigerode, M.D., a state

agency medical consultant, completed a Physical Residual

Functional Capacity Assessment (Tr. at 234-241).  Dr.

Minnigerode found that plaintiff can occasionally lift and

carry 20 pounds, frequently lift and carry ten pounds, stand

or walk for four to six hours in an eight-hour day, sit for

about six hours per eight-hour day, must periodically

alternate sitting and standing a little less than every two

hours, and has an unlimited ability to push or pull except

33

cannot repetitively use her arms overhead. She found that plaintiff can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but should never climb ladders, ropes, or scaffolds. She found that plaintiff cannot do repetitive overhead reaching but was unlimited in her ability to handle, finger, and feel. Plaintiff had no visual or communicative limitations. She should avoid concentrated exposure to extreme cold and hazards such as machinery and heights, and she should avoid even moderate exposure to vibration, but had no other environment limitations.

When asked whether the severity or duration of the symptoms were disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairments, Dr. Minnigerode wrote, "perhaps". She then wrote that it was impossible to sort out physical versus psychological allegations.

In support of her findings, Dr. Minnigerode wrote in part:

> . . . She has had documented spasm, mostly in the back, and is on both Flexeril and Zanaflex, as well as Paxil. She lists mental fog, dizziness, and memory loss after she takes these. . . Review of ADL's [activities of daily living] indicates some minimal allegations regarding sitting, but are so intertwined with her memory loss that it is impossible to sort out the

34

actual physical allegations.  Psych has already reviewed and indicates M/V denial. At recent psych CE, she sat for almost 2 hours without noted discomfort. . . Current physical RFC [residual functional capacity] is supported for 20/10#, no overhead, stand/walk 4-6, and perhaps limit sitting to somewhat less than 2 hours (however, this is not decisional if she can walk) since it is well known that spondylolysis patients have more pain problems with sitting than walking generally.

On January 7, 2004, plaintiff returned to see Dr. Morgan for right shoulder pain.  Dr. Morgan diagnosed "early frozen shoulder".  The treatment section appears to say physical therapy referral and "d/c [discontinue] wt [weight] training].

On March 9, 2004, plaintiff returned to see Dr. Morgan for cervical pain (Tr. at 260).  Dr. Morgan performed osteopathic manipulation therapy and told plaintiff she could repeat that as needed.

On May 20, 2004, plaintiff saw Patrick Caffrey, Ph.D., a licensed psychologist, neuropsychologist, and vocational specialist, for a neuropsychological evaluation (Tr. at 242-252).  Portions of Dr. Caffrey's report read as follows:

> PRESENTING ISSUES:  Teresa presents with multiple pain complaints.  She complained, also, of cognitive impairments, including impaired memory and impaired word finding ability. She also tends to get lost when walking in the community.  She also complained of general absentmindedness.  She believes that her memory problems are not limited to short term memory, but also long term memory.  She also complained of a tendency to lose her belongings somewhat, and has poor

35

concentration.  All of these problems were first
noticeable seven to eight years ago. . . .

PAST MEDICAL HISTORY:  . . .  The patient reports
cognitive difficulties, including short and long term
memory impairment, comprehension problems when people
try to talk to her, and auditory comprehension
difficulties. . . .

The psychological report performed by Robert Pulcher,
Ph.D., dated December 9, 2003, included Trail Making
Tests A & B and the Wechsler Memory Scale-III (WMS-
III).  This report, therefore, overlaps somewhat with
the testing performed by Dr. Pulcher.  There [should
be] a minimum of six months separation between testing
sessions.  By my count, it had been only five months.
The current results, therefore, have questionable
validity because it had only been five months since she
had taken Trail Making Tests A & B and the WMS-III. . .
.

In a separate interview with the patient, she
corroborated very well the information in the records.
. . .

She first became aware of difficulties with depression
in about 1997.  At that time, she was excessively tired
and cried often. . . .  She has taken antidepressant
medications over time, including Paxil, Prozac, and
Paxil CR.  She also has a history of difficulties with
anxiety, but with no panic attacks. . . .

Her current medications include Lexapro, thyroid
medicine, Lasix (the generic version), calcium, B-12,
Flexeril, and Zanaflex. . . .

SENSORY SYSTEMS:  . . .  She experiences transient
numbness in the arms, hands, and legs.  She believes
this is radiculopathy from the neck and back.  Her
extremities also tingle, at times. . . .

EDUCATIONAL AND VOCATIONAL HISTORY:  . . .  Her most
recent job was on May 23, 2003, but she quit secondary

36

to medical reasons.  She has been unable to find work because of her difficulties with pain and decreased cognition. . . .

SOCIAL HISTORY:  . . .  Teresa rarely drives, and when she does she self-limits to just around the neighborhood.  She has a good driving record and a valid license.  She has no pending legal issues, except some worries regarding financial strain since she has not been employed lately.  She is able to perform all of her basic activities of daily living, such as dressing, grooming, and bathing.  She is able to help out somewhat around the house, but has her bad days where she must stay in bed all day because of pain.  She indicated that she had a bad reaction to the Paxil CR last summer and spent a lot of time in bed.  Her husband generally performs the yard work, but she involves herself in the yard work by directing him to various tasks.

For leisure she enjoys spending time with her grandchildren. She also cares for their two dogs.  She also enjoys sitting in the boat while her husband fishes.  Prior to the onset of her cognitive problems, she used to be an avid reader.  She no longer reads because of difficulties with comprehension.

**PROCEDURES**

TEST TAKING BEHAVIORS: . . .  She was able to move about independently with no obvious gait disturbance. She tended to waive off breaks in favor of completing the evaluation. . . .

TESTS ADMINISTERED:
1.   Wechsler Adult Intelligence Scale-III (WAIS-III)
2.   Wechsler Memory Scale-III (WMS-III)
3.   Trail Making Tests A & B
4.   Test for Lateral Dominance
5.   Finger Tapping Test
6.   Grip Strength Test
7.   Grooved Pegboard Test
8.   Halstead Category Test
9.   Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
10.  Speech Sounds Perception Test

37

11.   Seashore Rhythm Test
12.   Wide Range Achievement Test-3 (WRAT-3)
13.   Boston Naming Test (BNT)

**TEST RESULTS**

NEUROPATHOLOGICAL IMPLICATIONS: . . .  The Executive
domain includes measures of attention, mental speed,
sequencing, planning ability, mental efficiency, and
judgment.  Teresa scored in the normal range, when
corrected for age and education level, for mental
speed, sequencing, and mental efficiency.  She scored
also in the normal range for measures of attention from
the Speech Sounds Perception Test, which requires
listening to a prerecorded tape and making
discriminations on phonemes, and for the Seashore
Rhythm Test, which requires discriminating rhythmic
patterns from a prerecorded tape.  She scored, however,
in the very mild range of impairment for attention
derived from te WAIS-III Digit Span subtest, which
requires brief, intense concentration.  She scored,
however, in the moderate range of impairment for
planning ability and judgment, which is derived from
the Halstead Category Test.

The Cognitive domain includes measures of reasoning,
problem solving, spatial relations, and social
understanding.  It also provides impairment ratings for
the WAIS-III IQ scores.  She posted a Verbal IQ of 96,
Performance IQ of 109, and a Full Scale IQ of 102.  All
three measures were in the normal range when corrected
for age and education level.  Teresa scored in the
normal range for spatial relations, social
understanding, and reasoning.  Measures of problem
solving, however, were somewhat split, in which she
scored in the normal range when based on the problem
solving required for the Block Design subtest, which
requires perceptual organization skills, but in the
moderate range of impairment for problem solving
related to the Halstead Category Test, which requires a
type of novel problem solving.

The Language domain includes measure of word finding
ability, receptive language, and scholastic
achievement.  She scored in the normal range for word
finding, based on the results of the BNT.  This

38

suggested no measurable deficit for word finding
ability. She also scored well within the normal range
for receptive language. Measures involving scholastic
achievement were also in the normal range for reading
and spelling, but in the very mild range of impairment
for written arithmetic. On a separate measure of
reading involving the Speech Sounds Perception Test,
which requires discrimination of phonemes, she was also
in the normal range. Phonemes represent the basic
elements of spoken language. She also scored well
within normal limits for the Seashore Rhythm Test,
which requires discrimination of rhythmic patterns.

The Memory testing included an update of her scores
using the WMS-III. The test, however, was administered
five months prior, making the current results invalid.
There is the requirement of a six-month separate
between administrations of this test. I believe,
however, that a comparison of the scores is meaningful.
The scores are revealed below.

| Primary Index | Index Score 12/9/03 | Index Score 5/17/04 |
|---|---|---|
| Auditory Immediate | 80 | 80 |
| **Visual Immediate** | **94** | **78** |
| Immediate Memory | 84 | 74 |
| Auditory Delayed | 92 | 86 |
| Visual Delayed | 100 | 97 |
| **Auditory Recognition Delayed** | **90** | **75** |
| General Memory | 92 | 84 |
| Working Memory | 99 | 108 |

As noted above, she was consistent in her scores for
Auditory Immediately, Auditory Delayed, Visual Delayed,
and Working Memory. She scored significantly lower,
however, on Visual Immediate and Auditory Recognition
Delayed. This suggested some decline in her overall
performance as it relates especially to encoding new
visual learning. It was also somewhat concerning that
she scored poorly for Auditory Recognition Delayed.
This could be attributed to her poor recognition of
items from the story recall.

Additional comparison is afforded by the age adjusted
scaled scores listed below:

39

| Primary Subtest | 12/9/03 | 5/17/04 |
|---|---|---|
| Logical Memory I | 5 | 4 |
| **Logical Memory II** | **9** | **6** |
| Faces I | 5 | 7 |
| Faces II | 6 | 7 |
| Verbal Paired Associates I | 8 | 9 |
| Verbal Paired Associates II | 8 | 9 |
| **Family Pictures I** | **13** | **6** |
| Family Pictures II | 14 | 12 |
| **Letter-Number Sequencing** | **8** | **12** |
| Spatial Span | 12 | 11 |

She has had notable decline for Family Pictures, which provides a measure of visual contextual memory for the initial encoding, but she had good recall after the delay. She also had significant separate in scores for the Logical Memory subtest, especially for the delayed trial. This suggested rapid decay of newly encoded auditory semantic material. There is little separate, however, in her Logical Memory I score. She also had a significant improvement, however, in her Letter-Number Sequencing score, which may, however, reveal the practice effects.

The Memory domain from the HRNES-R organizes the scores into three groups, including immediate (no delay), recent (30-minute delay), and remote recognition (over learned and established knowledge). She scored in the normal range for remote recognition memory. She scored, however, in the moderate range of impairment for immediate memory. Measures involving recent memory were in the mild to very mild range of impairment.

The Local Memory subtest requires the subject to learn and remember two stories of paragraph length. On the initial version she scored in the mild range of impairment. On the delayed trial she also scored in the mild range of impairment. The Logical Memory Percent Retention score, however, was in the very mild range of impairment, suggesting she was having greatest difficulty with the initial encoding of auditory semantic material.

The Visual Reproduction subtest requires the subject to reproduce geometric figures after 10 seconds of

40

exposure time. She scored in the mild range of
impairment for the initial trial, but in the very mild
range of impairment on the delayed trial. The Visual
Reproduction Percent Retention score was in the normal
range. This also suggested initial difficulties with
encoding. She tended to perform better for visual
figural learning with better storage and retrieval.
Measures of Spatial Span require working memory for
remembering a spatial array. She scored in the normal
range for this test.

Additional scores included the Faces I and II subtests,
which require recognition of a group of faces from a
larger group. She scored in the mild range of
impairment for the immediate and delayed measure. The
Verbal Paired Associates subtest requires learning
pairs of words across four trials. She scored within
normal limits for this test on the initial and delayed
trials, suggesting good ability for associate learning.

The Family Pictures subtest also provides an initial
and delayed measure of visual contextual memory. The
initial score was in the moderate range of impairment,
but was much better for the delayed trial. The delayed
trial score was in the high average range.

The Mental Control subtest provides a measure of
ability to demonstrate processing speed for tasks that
require retrieval of over learned information. She
scored well within normal limits for this subtest.

The Motor domain includes measures of motor speed, grip
strength, fine motor coordination, and psychomotor
speed. Psychomotor speed is a term that refers to the
combined skills of motor speed and thinking speed.
Teresa scored in the normal range for psychomotor
speed. She also scored in the normal range for finger
tapping, grip strength, and fine motor coordination.
There also was no evidence of lateralization to one
side of the body regarding motor functions.

EMOTIONAL STATUS AND PERSONALITY CHARACTERISTICS: The
MMPI-2 was administered to detect psychopathology and
adjustment problems. This was a valid profile. The K
scale of the validity scales, however, was elevated

41

significantly.  Persons who score high on this particular scale are generally motivated to present themselves as conforming and conventional.  This suggests a somewhat defensive test taking approach.

Many of the clinical scales were elevated significantly.  She had the most prominent elevation of scales 1, 3, and 2, in that order.  This particular configuration is sometimes referred to as the "conversion valley."  Persons with this particular profile often show classic conversion symptoms or somatoform pain disorder.  Stress is often converted into physical symptoms.  Persons with this profile tend to use denial and repression, and they lack insight into the causes of their symptoms.  They tend to resist psychological explanations for their problems.  Although these individuals tend to be rather sociable, they tend to be passive-dependent in relationships.  It is important for them to be liked and approved of by others, and their behavior typically is conforming and conventional.

She also had significant elevation of scales 7 and 8, in that order.  Persons with this elevation pattern are usually not hesitant to admit to psychological problems.  They report feeling depressed, worried, tense, and nervous.  They tend to show poor judgment and do not seem to profit from experience.  They harbor chronic feelings of insecurity, inadequacy, and inferiority, and they tend to be quite indecisive, at times.  They are passive-dependent individuals who are unable to take a dominant role in interpersonal relationships.

The above profile suggests that she has a significant psychological component to her overall presentation, including significant findings for depression and anxiety.  It is also highly likely that she has deficient skills for managing stress.

DMS IV-TR DIAGNOSIS:
Axis I:    Cognitive Disorder NOS, Mild Neurocognitive
           Disorder from as yet Undetermined Etiology
           Pain Disorder Associated with Both
           Psychological Factors and a General Medical

42

```
                    Condition, Chronic
                    Adjustment Disorder with Mixed Anxiety and
                    Depressed Mood
      Axis II:      No Diagnosis
                          *  *  *  *  *
      Axis IV:      Acute and Chronic Stress as it Relates to
                    Health Concerns and Financial Strain
      Axis V:       Current GAF²⁴: 65; Highest GAF Past Year:  65
```

## CONCLUSIONS

. . .  I believe she has a significant psychological
component to her illness.  She met the diagnostic
criteria for Cognitive Disorder NOS, Mild
Neurocognitive Disorder, as well as Pain Disorder with
Both Psychological and Medical Factors.  I believe,
also, she presents with Adjustment Disorder with Mixed
Anxiety and Depressed Mood.

She has been treated for depression on a long term
basis.  She is currently taking Lexapro, which has been
found to have good results in treating depression with
fewer side effects than earlier versions of
antidepressant medicines.  She should continue to seek
treatment for the depression.  Depression, as you know,
can interfere with cognitive functioning especially for
tasks that require brief, intense concentration and
psychomotor speed.  To this extent, some of her
complaints about cognitive functioning may be
reversible, contingent on optimal treatment for the
depression.

## RECOMMENDATIONS
                          *  *  *  *  *
2.    That Teresa be considered a marginal candidate for
      returning to work in competitive settings, mostly
      related to difficulty she is having with chronic
      pain.  From a neuropsychological standpoint, she

---

      ²⁴A Global Assessment of Functioning of 65 means some
mild symptoms (e.g., depressed mood and mild insomnia) OR
some difficulty in social, occupational, or school
functioning (e.g., occasional truancy, or theft within the
household), but generally functioning pretty well, has some
meaningful interpersonal relationships.

appears to be a good candidate for returning to
employment settings where she can take full
advantage of her transferable skills.  New or
complex job settings that are unfamiliar to her,
however, will expose her impairments.

* * * * *

4.    That Teresa make an effort to maintain her
      community activities and participate in mentally
      stimulating activities, such as word puzzles,
      crossword puzzles, jigsaw puzzles, etc., in order
      to help her stay mentally sharp.

5.    That Teresa not be considered a good candidate for
      placement in training settings, given the
      weaknesses identified in this report.

6.    That Teresa learn memory compensatory skills, such
      as association, in order to help compensate for
      difficulties with new learning.

On February 1, 2005, plaintiff saw some doctor whose

signature is illegible but appears to be the writing of Dr.

Laurie Fisher (Tr. at 269).  Plaintiff's chief complaint was

"discuss disability".  Under review of symptoms, the doctor

wrote, "trying to get disability".  Dr. Fisher performed an

exam and checked "normal" on everything except plaintiff's

right hip which had increased tenderness.  She assessed

right hip pain, depression, lumbar degenerative disc

disease, cervical degenerative disc disease, and migraines.

Under plan, she wrote continue regular [illegible].  The

other "plan" is also illegible.

44

On April 5, 2005, Dr. Laurie Fisher completed a
Physical Residual Functional Capacity Questionnaire (Tr. at
271-275).  Portions of the questionnaire read as follows:

1.   Frequency and length of contact:   have seen pt
     [patient] since 9-28-04 q [every] 3 mos [months].

2.   Diagnoses:   chronic right hip pain, depression,
     lumbar & cervical DDD [degenerative disc disease]

3.   Prognosis:   poor

4.   List your patient's *symptoms*, including pain,
     dizziness, fatigue, etc.:
      pain, poor memory & concentration, poor
     comprehension, depressed mood & motivation

5.   If your patient has pain, characterize the nature,
     location, frequency, precipitating factors, and
     severity of your patient's pain:
      chronic back & neck pain at times severe -
     constant, intensifies at times, increases with
     activity and prolonged standing and sitting

6.   Identify the clinical findings and objective
     signs:
      tenderness lumbar spine & right sciatic
     [illegible] decreased ROM [range of motion],
     tenderness cervical spine

7.   Describe the treatment and response including any
     side effects of medication that may have
     implications for working, e.g., drowsiness,
     dizziness, nausea, etc.
      pt. is on Lexapro for depression which has helped

                    * * * * *

11.  Identify any psychological conditions affecting
     your patient's physical condition:
     [Depression is checked, anxiety is not checked]

                    * * * * *

                        45

13. How often during a typical workday is your
    patient's experience of pain or other symptoms
    severe enough to interfere with **attention and
    concentration** needed to perform even simple work
    tasks?
    [Dr. Fisher checked "constantly"]

14. To what degree can your patient tolerate work
    stress?
    [Dr. Fisher checked "incapable of even low stress
    jobs"]
    Please explain the reasons for your conclusion:
    has persistent poor concentration & focus

Dr. Fisher stated that plaintiff could walk less than
one block before needing to rest or experiencing severe
pain. She said plaintiff could sit for a maximum of 20
minutes at a time, and that plaintiff could stand a maximum
of 15 minutes at a time. She said plaintiff could stand or
walk for a total of less than two hours per day, and that
she could sit for a total of about two hours in an entire
eight-hour work day. Plaintiff also needs, in Dr. Fisher's
opinion, to walk around every 20 minutes during the day for
five minutes. Plaintiff needs to shift positions at will
from sitting to standing to walking. She needs to take
unscheduled breaks during the day every hour for 30 minutes
each time. She said that plaintiff could rarely lift or
carry less than ten pounds and should never carry ten pounds
or more.

46

Dr. Fisher found that plaintiff could occasionally look down or turn her head, can rarely look up, and can frequently hold her head in a static position. She could rarely twist, stoop, or climb stairs, but should never crouch, squat, or climb ladders. When asked whether plaintiff had significant limitations with reaching, handling, or fingering, Dr. Fisher checked "no", then scratched that out and checked "yes". She wrote that plaintiff can grasp, turn or twist objection "0%" of the day with either hand. She said plaintiff could reach with her arms "0%" of the day. She said plaintiff could use her fingers "10%" of the day. Finally, Dr. Fisher wrote that plaintiff would miss more than four days of work per month due to her impairments or treatment.

The form asks whether the symptoms and limitations described have been present since January 1, 2003, and, despite the fact that Dr. Fisher had only been seeing and treating plaintiff since September 28, 2004, she wrote "yes".

On April 14, 2005, plaintiff returned to see Dr. Fisher complaining of back pain (Tr. at 270). Plaintiff's neck was normal to palpation. Dr. Fisher found increased tenderness in the lumbar area, negative straight leg raising. She

47

diagnosed lumbar radiculopathy. Dr. Fisher referred
plaintiff for pain management and told her to continue her
current medications.

On April 19, 2005, plaintiff completed a patient intake
form at North Kansas City Hospital (Tr. at 283-286). In
that form she noted that she fell off the second step of a
ladder in October of 2004. She wrote that walking, sitting,
turning her head, reaching, standing, and lying down make
her pain worse. Plaintiff was asked whether there had been
any changes in her mood, and she wrote, "no". She reported
that her legs get weak climbing stairs and that she cries
easily if she is not taking her medication.

On April 25, 2005, plaintiff saw Dr. Scowcroft at the
request of Dr. Fisher (Tr. at 277-278). Plaintiff's chief
complaint was lower back and right leg pain. "The last time
we saw her was two years ago and since then she had been
doing relatively well. Her pain has returned. . . . Her
pain is typically worse when she is walking, but it can be
aggravat[ed] with standing as well as sitting for an
extended period of time." Plaintiff's back was tender to
palpation. Her strength in her lower extremities was
preserved. Dr. Scowcroft's impression was recurrent
radiculitis. He recommended plaintiff undergo repeat

48

epidural steroid injections.

On April 29, 2005, plaintiff had a lumbar epidural
steroid injection performed by Dr. Scowcroft (Tr. at 279).

On May 3, 2005, plaintiff had a lumbar epidural steroid
injection performed by Dr. Scowcroft (Tr. at 297-301).

On May 17, 2005, plaintiff saw Dr. Scowcroft (Tr. at
304). "She has undergone two injections with good
improvement of her radicular symptoms. She is still having a
fair amount of muscular pain. she will receive her third
injection today. I did encourage the patient to perform
home exercises and will give her another booklet today and
review this with her."

C.    *SUMMARY OF TESTIMONY*

During the June 6, 2005, hearing, plaintiff testified
as follows.

At the time of the administrative hearing, plaintiff
was 51 years of age and is currently 53 (Tr. at 317).
Plaintiff has a high school education (Tr. at 317).

Plaintiff's alleged onset date is May 22, 2003 (Tr. at
317). On that day, she decided to quit her job because she
had been missing work, she was in pain while sitting or
standing, she was taking medication that sedated her, and
mentally she knew she was not performing her job like she

49

should have been (Tr. at 317). Plaintiff was a receptionist
at that time (Tr. at 317). Previously, plaintiff had been
an executive administrative assistant, but she had to step
down from that position due to her mental capacity (Tr. at
318). She was actually bought out, and she followed her
boss to a new company where she requested the receptionist
job because she knew she could not fulfill the duties of
administrative assistant (Tr. at 318).

Plaintiff was having trouble writing shorthand and
typing what she had written, she was having trouble writing
things down when she answered phone calls, and she was
having trouble remembering how many copies of things to make
(Tr. at 318). After plaintiff accepted the position as
receptionist, she continued to have difficulties (Tr. at
318-319). There were 35 sales people, and she had to take
phone messages for some of them (Tr. at 319). She had
trouble writing down the correct numbers and taking messages
accurately (Tr. at 319). Plaintiff chose on her own to
leave this job (Tr. at 319).

Plaintiff also had trouble sitting at a computer all
day, and she started getting severe migraines (Tr. at 319).
Since she quit working, she does not get migraines, but her
back is getting worse (Tr. at 320). Plaintiff had pain in

50

her neck, her thoracic spine, her hip, and her leg (Tr. at 320). Sitting does not relieve the pain, she needs to lie down (Tr. at 320). Plaintiff has to get up about every 90 minutes to two hours because she cannot lie still for that long (Tr. at 321). She gets about two and a half to three hours sleep total each night (Tr. at 321-322). Plaintiff lies down during the day, and she may doze off for ten or 15 minutes (Tr. at 322).

Plaintiff is not sure if her problem is with her memory, or her inability to express what she has in her mind (Tr. at 323). Plaintiff no longer drives because it hurts her shoulders and neck, but she also forgets where she is going and she panics (Tr. at 323).

Plaintiff has been taking antidepressants for six or seven years (Tr. at 324). She starting taking antidepressants because she cried for no reason, and now she no longer cries (Tr. at 324).

Plaintiff's epidural injections help for a while, but they wear off (Tr. at 325). Plaintiff has had back problems since she was a child, but her condition is getting progressively worse (Tr. at 326).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Frederick Harap entered his decision on August 10, 2005 (Tr. at 15-23).

The ALJ found at step one that plaintiff had not engaged in substantial gainful activity since her alleged onset date (Tr. at 16).

At step two, the ALJ found that plaintiff's cervical and lumbar spine condition with radicular pain, her cognitive deficit, and her migraine headaches are severe impairments (Tr. at 16).  However, he found that plaintiff's depression is a non-severe impairment (Tr. at l16).

At step three, the ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16).

The ALJ found that plaintiff retained the residual functional capacity to carry up to 20 pounds occasionally and ten pounds frequently, sit for up to six hours per day, but must change positions every two hours.  She can stand or walk for four hours per day.  She must avoid workplace hazards.  She has mild limitations with respect to activities of daily living and social functioning and moderate limitations with respect to concentration, persistence, or pace and as a result cannot understand,

52

remember, and carry out complex or detailed instructions (Tr. at 21).

At step four, the ALJ found that plaintiff could return to her past relevant work as a receptionist, which is semi-skilled work performed at the sedentary exertional level (Tr. at 22). Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI. OPINION OF TREATING PHYSICIAN DR. LAURIE FISHER

Plaintiff argues that the ALJ erred in discrediting the opinion of treating physician, Dr. Laurie Fisher. The ALJ had this to say about Dr. Fisher:

> I further note that Dr. Laurie Fisher completed a "Physical Residual Functional Capacity Questionnaire" on April 4, 2005. On the questionnaire, Dr. Fisher diagnosed chronic right hip pain, cervical and lumbar degenerative disc disease, hip pain and depression. Included in the limitations she identified for the claimant were the following: sitting for 20 minutes at one time, for a total of two hours in an eight-hour work day; standing for 15 minutes at a time, for a total of less than two hours in an eight-hour work day; and rarely lifting less than ten pounds, and never lifting 20 pounds or more. Dr. Fisher also noted that the claimant could not handle even a low stress work environment due to "[the claimant's] persistent poor concentration & focus." When asked to identify treatment, responses, and medication side-effects for these conditions, Dr. Fisher simply noted that the claimant was taking Lexapro. The record shows that the claimant presented to Pain Management to begin a course of epidural steroid injections on April 29, 2005. According to a chart note authored by Dr. Scowcroft on May 17, 2005, the claimant demonstrated "good improvement" from the first two injections. Dr. Fisher

53

identified significant limitations as a result of the
claimant's physical impairments, yet the only
medication she noted was an anti-depressant. Moreover,
Dr. Fisher's opinion was rendered before the
commencement of a treatment course that resulted in
improvement. Therefore, I afford her opinion little
weight.

(Tr. at 21-22).

A treating physician's opinion is granted controlling
weight when the opinion is not inconsistent with other
substantial evidence in the record and the opinion is well
supported by medically acceptable clinical and laboratory
diagnostic techniques. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920
(8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th
Cir. 2005). If the ALJ fails to give controlling weight to
the opinion of the treating physician, then the ALJ must
consider several factors to determine how much weight to
give to the opinion of the treating physician: (1) the
length of the treatment relationship, (2) frequency of
examinations, (3) nature and extent of the treatment
relationship, (4) supportability by medical signs and
laboratory findings, (5) consistency of the opinion with the
record as a whole, and (6) specialization of the doctor. 20
C.F.R. § 404.1527(d)(2) - (5).

***Length of the treatment relationship.*** The records
establish that plaintiff first saw Dr. Fisher on November

54

24, 2003, and her chief complaint was "neck and back pain" (Tr. at 258). The records state that Lexapro (an anti-depressant) was helping. Dr. Fisher found decreased cervical range of motion, but there are no measurements listed. She diagnosed cervical radiculopathy and neck and back pain. She performed osteopathic manipulation therapy and occipital release [putting pressure on the back of the head].

Plaintiff saw Dr. Fisher again on January 7, 2004, complaining of right shoulder pain (Tr. at 259). She found decreased range of motion in the shoulder, but again listed no measurements. She assessed early frozen shoulder, performed osteopathic manipulation therapy, and told plaintiff to discontinue weight training.

Plaintiff saw Dr. Fisher on March 9, 2004, for cervical pain (Tr. at 260). She again performed osteopathic manipulation therapy and wrote "repeat as needed".

Plaintiff saw Dr. Fisher on April 28, 2004, for poison ivy (Tr. at 261). She saw Dr. Fisher on May 10, 2004, for a rash (Tr. at 262). She came in on May 24, 2004, for a swollen ankle (Tr. at 264).

Plaintiff saw Dr. Fisher on November 3, 2004, for a mammogram (Tr. at 256). There is no mention of any of

plaintiff's impairments in that record.  Plaintiff had a colonoscopy on November 16, 2004, at the request of Dr. Fisher, but Dr. Fisher did not perform that exam (Tr. at 257).  Plaintiff was found to have mild diverticulosis, again not relevant to her impairments in this case.  She saw Dr. Fisher on February 1, 2005, to discuss disability (Tr. at 269).

Those are all of the visits plaintiff had with Dr. Fisher prior to Dr. Fisher completing the Physical Residual Functional Capacity Questionnaire on April 4, 2005.

Although Dr. Fisher had actually been treating plaintiff since November 24, 2003, Dr. Fisher wrote in the RFC questionnaire that she had been treating plaintiff only since September 28, 2004.  That raises the question whether Dr. Fisher referred to the medical records from November 2003 through September 2004 prior to completing the RFC Questionnaire.

***Frequency of examinations***.  Dr. Fisher noted in the RFC Questionnaire that she saw plaintiff every three months. However, the medical records that were provided by Dr. Fisher's office indicate that plaintiff saw Dr. Fisher once in 2003 for neck and back pain, twice in January and March 2004 for shoulder and neck pain, three times during the

56

spring of 2004 for poison ivy and other unrelated ailments, once in November 2004 for a mammogram, and then again in February 2005 to discuss disability. Therefore, plaintiff had not been seen by Dr. Fisher for treatment of any of the impairments she claims are causing her to be disabled for the 13 months preceding Dr. Fisher's RFC Questionnaire.

***Nature and extent of treatment relationship***. As mentioned above, plaintiff saw Dr. Fisher for poison ivy, a rash, a swollen ankle, and a mammogram during the year before Dr. Fisher completed the RFC Questionnaire. Plaintiff saw Dr. Fisher twice for her disability-related impairments, and those visits were more than a year before Dr. Fisher completed the RFC Questionnaire.

***Supportability by medical signs and laboratory findings***.

Attention and Concentration. Dr. Fisher found that plaintiff's pain or other symptoms are severe enough to interfere with her attention and concentration "constantly." However, Dr. Fisher never even prescribed any pain medication during any of plaintiff's visits. Dr. Fisher performed osteopathic manipulation therapy and occipital release.

On November 24, 2003, when plaintiff saw Dr. Fisher, Dr. Fisher noted that plaintiff's pain was "mild". On January 7, 2004, when plaintiff saw Dr. Fisher, Dr. Fisher noted that plaintiff's pain was "moderate", not severe. On March 9, 2004, plaintiff's pain was "mild" and "moderate", not severe. On May 24, 2004, Dr. Fisher crossed out "in pain", and none of the pain levels were checked (mild, moderate, severe). Therefore, Dr. Fisher's medical records do not support her finding that plaintiff's pain is so severe that it constantly interferes with plaintiff's attention and concentration.

Additionally, the only medical record from Dr. Fisher's office which even mentions poor memory and concentration is the record dated February 1, 2005, when plaintiff's chief complaint was "discuss disability". There is no other record of plaintiff complaining of those symptoms to Dr. Fisher or Dr. Fisher noticing that plaintiff's memory or concentration were impaired in any way.

Incapable of even low stress jobs. Dr. Fisher found that plaintiff was incapable of even low stress jobs due to her "persistent poor concentration and focus". Again, as discussed above, there is nothing in Dr. Fisher's medical records to support a finding of poor concentration or focus.

58

If Dr. Fisher's findings were somehow related to plaintiff's depression, I find that her opinion is unsupported in that respect as well. On November 24, 2003, when plaintiff saw Dr. Fisher for neck and back pain, Dr. Fisher did <u>not</u> check "anxious", "fatigued", or "depressed".[25] On January 7, 2004, Dr. Fisher did not find that plaintiff was depressed, and did not find that she had a flat affect. Rather, she was "alert" and "pleasant". On March 9, 2004, plaintiff did not have a flat affect and was not depressed, she again was "alert," "pleasant" and "neat." On April 28, 2004, Dr. Fisher did not find that plaintiff was depressed or fatigued. She was alert and in no apparent distress. On May 10, 2004, Dr. Fisher did not find that plaintiff was depressed, anxious, or fatigued. Rather, she was alert, neat, and pleasant. On May 24, 2004, Dr. Fisher did not find that plaintiff was anxious, depressed, fatigued, or had a flat affect. Rather, plaintiff was alert and pleasant. On April 14, 2005 -- ten days after Dr. Fisher completed the RFC Questionnaire -- she found that plaintiff was alert and in no apparent distress, plaintiff

_____

[25]Dr. Fisher's records list, under physical exam, multiple possible findings. On each record, she checked some of those findings, but on the November 24, 2003, record she did not check anxious, fatigued, or depressed.

Case 4:05-cv-01163-REL   Document 12   Filed 01/04/07   Page 59 of 74

was not anxious, fatigued, depressed, or in pain, and she did not have a flat affect.

Clearly, Dr. Fisher's records do not support her findings in the RFC Questionnaire.

Plaintiff's ability to sit. Dr. Fisher found in the RFC Questionnaire that plaintiff could sit for only 20 minutes at a time and for only two hours per work day. There is absolutely nothing in any of Dr. Fisher's medical records which indicates that plaintiff ever complained of an inability to sit or that Dr. Fisher recommended that plaintiff limit her sitting. Again, Dr. Fisher never prescribed any pain medication, and the only restriction she ever placed on plaintiff was to discontinue weight training.

Plaintiff's ability to stand. Dr. Fisher found in the RFC Questionnaire that plaintiff could stand for 15 minutes at a time and for less than two hours per work day. Again, there is nothing in any of Dr. Fisher's medical records suggesting that plaintiff complained of trouble with prolonged standing or that Dr. Fisher recommended that plaintiff limit her standing in any way. Dr. Fisher never found plaintiff to be in severe pain, and in most of her records, plaintiff was either in no pain or in mild pain.

Need to take unscheduled breaks.  Dr. Fisher found in
the RFC Questionnaire that plaintiff would need to take a 30
minute break every hour.  Once again, there is nothing in
any of Dr. Fisher's medical records suggesting that
plaintiff needs to take any breaks during the day.

Plaintiff's ability to lift.  Dr. Fisher found in the
RFC Questionnaire that plaintiff could never lift ten pounds
or more, and that she could only rarely lift less than ten
pounds.  She also found that plaintiff could never grasp,
turn, or twist objects with her hands, she could never
reach, and she could only use her fingers for fine
manipulation 10% of the time.  There is nothing in any of
Dr. Fisher's medical records wherein plaintiff complained of
trouble lifting or pain with lifting or using her hands and
arms.  The only restriction Dr. Fisher placed on plaintiff
was to discontinue weight training.  These records do not
support her findings regarding plaintiff's ability to lift
or use her hands, fingers, and arms.

Plaintiff's absence from work.  Finally, Dr. Fisher
found that plaintiff would need to miss work more than four
days per month because of her impairments or treatment.
Since the medical records do not show that plaintiff saw Dr.
Fisher that frequently for treatment, and the records do not

61

support a finding that plaintiff was in severe pain ever during the time that Dr. Fisher treated plaintiff, there is no basis in the medical records for this finding.

***Consistency with the record as a whole***. On September 15, 2003, plaintiff saw Dr. Chilton, a neurosurgeon. Plaintiff denied clumsiness with her hands, which directly contradicts Dr. Fisher's findings that plaintiff cannot ever grasp, turn, or twist objects with her hands and that she can only manipulate things 10% of the time.

Plaintiff told Dr. Chilton that she quit her last job (on her alleged onset date) because of neck pain, not due to any type of memory or concentration problems.

Dr. Chilton found that plaintiff had full range of motion in her neck and head without significant pain. She could heel walk, toe walk, and tandem gait without difficulty. He recommended "observation and symptomatic management, and suggested that she progress with activities as tolerated." Dr. Chilton did not prescribe any pain medication or recommend any type of pain therapy.

On December 9, 2003, plaintiff saw Robert Pulcher, Ph.D., who observed that plaintiff was able to sit through a two-hour appointment without any noted discomfort. This directly contradicts Dr. Fisher's findings that plaintiff

62

can only sit for 20 minutes at a time and for a total of two hours per day, and that she would need to take a 30 minute break every hour.  Dr. Pulcher conducted several tests and determined that plaintiff suffered only mild memory loss, which contradicts Dr. Fisher's findings that plaintiff cannot perform any work due to her problems with lack of attention, concentration, and focus.

On December 16, 2003, Dr. Morrison found that plaintiff had only mild difficulty in maintaining concentration, again contradicting Dr. Fisher's findings.

On December 17, 2003, Dr. Minnigerode found that plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for four to six hours, sit for six hours, and was able to use her arms and hands except for repetitively using her arms overhead.  This contradicts all of Dr. Fisher's findings.

On May 20, 2004, plaintiff told Patrick Caffrey, Ph.D., that she had been experiencing memory problems for the past seven to eight years.  During most of those years, plaintiff was engaged in full-time work earning a substantial salary. Plaintiff told Dr. Caffrey that she enjoys sitting in the boat while her husband fishes.  It is unrealistic that plaintiff's husband fishes for no more than 20 minutes at a

63

time, the maximum length Dr. Fisher found that plaintiff could sit at any one time.  Dr. Caffrey noted that plaintiff was able to move about independently with no obvious gait disturbance.  He also noted that plaintiff waived off breaks in favor of completing the evaluation, contradicting Dr. Fisher's finding that plaintiff would need to take a 30 minute break every hour.  Dr. Caffrey found that plaintiff was a good candidate for returning to work where she could take advantage of her transferrable skills.

All of these other medical records contradict the findings of Dr. Fisher in her RFC Questionnaire.  There are no records from any doctor which are consistent with Dr. Fisher's findings.

Based on all of the above, I find that Dr. Fisher's findings in the RFC Questionnaire are not supported by her own medical records and are not supported by any other records in this file.  Therefore, plaintiff's motion for summary judgment on the ground that the ALJ erred in discrediting Dr. Fisher's opinion in the RFC Questionnaire will be denied.

### VII. ALJ'S OPINION VERSUS OPINION OF MEDICAL EXPERTS

Plaintiff argues that the ALJ substituted his own lay opinion in place of the opinion of plaintiff's treating

64

physician and he drew his own inferences from the medical reports.

An RFC finding must be supported by some medical evidence; however, it is the ALJ who bears the primary responsibility for assessing a claimant's RFC based on all of the relevant evidence. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005), citing Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). The ALJ's independent analysis of the medical evidence is a legitimate part of the RFC determination process. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (noting with approval that the ALJ did not rely solely on reviewing physicians, but conducted his own analysis of the medical evidence in determining the claimant's RFC).

Plaintiff's specific complaint is that the ALJ did not adopt an RFC from any particular doctor, but determined that plaintiff's abilities were greater than the findings of some doctors and lesser than other findings. Although plaintiff included Dr. Fisher's findings in her argument, I have excluded those findings from this analysis as I previously found that the ALJ properly discredited Dr. Fisher's opinion.

Below is a chart showing the findings made by the ALJ, Dr. Minnigerode, and Dr. Morrison.

| | ALJ | Minnigerode | Morrison |
|---|---|---|---|
| Occasionally lift and carry | 20 lbs. | 20 lbs. | |
| Frequently lift and carry | 10 lbs. | 10 lbs. | |
| Stand or walk | 4 hours | 4-6 hours | |
| Sit | 6 hours | 6 hours | |
| Restriction of activities of daily living | Mild limitation | | Moderate limitation "but primarily for physical reasons" |
| Difficulty in maintaining social functioning | Mild limitation | | Mild |
| Difficulty in maintaining concentration, persistence or pace | Moderate | | Mild |
| Ability to understand and remember very short and simple instructions | Not significantly limited | | Not significantly limited |
| Ability to understand and remember detailed instructions | Limited | | Moderately limited |

The ALJ's findings were that plaintiff could stand or walk for a total of four hours rather than the four to six

66

found by Dr. Minnigerode, and the ALJ found that plaintiff had a moderate impairment in her ability to maintain concentration, persistence, or pace, whereas Dr. Morrison found that plaintiff was only mildly limited in those areas.

Clearly the ALJ adjusted plaintiff's ability to maintain concentration, persistence, or pace based on the findings by Dr. Caffrey, who conducted very detailed tests after Dr. Morrison had seen plaintiff.  The ALJ's finding regarding plaintiff's ability to stand and walk is within the limits set by Dr. Minnigerode, so there is no real difference there.

The ALJ found that plaintiff had a mild restriction in activities of daily living, while Dr. Morrison found plaintiff's limitation to be moderate.  However, Dr. Morrison's limitation was based on "physical reasons" and not on mental reasons.  Dr. Morrison did not explain what physical reasons he relied on, even in the functional capacity assessment at the end of the form.  Furthermore, Dr. Morrison found that "the claimant would be capable of performing adequately in a work-like setting".

There is no record that any of plaintiff's daily activities were ever restricted by any of her doctors. Plaintiff stated in her administrative forms that her self-

67

care has not changed since her condition started (Tr. at 82). She and her husband both reported that she is able to do laundry and dishes. There is no evidence in any of the medical records that plaintiff's daily activities were restricted, either from a physical or from a mental aspect.

Based on the above, I find that the ALJ's residual functional capacity assessment is supported by the credible medical evidence in the record. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. DEPRESSION

Plaintiff next argues that the ALJ erred in finding that plaintiff's depression is not a severe impairment.

An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

Dr. Pulcher found evidence of only mild depression and no evidence of a major depressive disorder. In December 2003 Dr. Pulcher assigned a GAF score of 65, indicating only mild psychological symptoms. Dr. Caffrey, in May 2004, also assigned a GAF score of 65, indicating only mild psychological symptoms.

68

As mentioned above, although Dr. Fisher assessed depression, she never observed plaintiff to be depressed, to be anxious, or to have a flat affect. Plaintiff was consistently observed by Dr. Fisher to be alert and pleasant.

Dr. Caffrey, who performed a significant number of tests, found that plaintiff scored in the normal range for mental speed, sequencing, mental efficiency, measure of attention from the Speech Sounds Perception Test, IQ, spacial relations, social understanding, reasoning, problem solving using the Block Design subtest, word finding, receptive language, scholastic achievement, discrimination of phonemes, discrimination of rhythmic patterns, remote recognition memory, visual reproduction retention, working memory for remembering a spatial array, associate learning, mental control, psychomotor speed, finger tapping, grip strength, and fine motor coordination.

He found that she scored in the very mild range of impairment for brief intense concentration, written arithmetic, recent memory, and initial encoding of auditory semantic material.

He found that she scored in the mild range of impairment for the local memory subtest, the visual

reproduction subtest, and recognition of a group of faces from a larger group.

Finally, he found that she scored in the moderate range of impairment for planning ability, judgment, novel problem solving, and immediate memory. He did note, however, that the results of the memory testing were invalid because plaintiff had taken the test just a few months earlier and the mandatory time between tests had not yet passed.

Plaintiff was treated with anti-depressant medication, but she was on this medication while she was employed full time, and she testified that her depression was stabilized with medication. There is no evidence that plaintiff ever received out-patient counseling for depression, nor was she ever hospitalized for any mental health condition. Finally, the ALJ noted that plaintiff did not list depression among the conditions that allegedly limited her ability to work in documents accompanying her application for benefits.

I find that the record supports the ALJ's determination that plaintiff's depression was not a severe impairment. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

Case 4:05-cv-01163-REL   Document 12   Filed 01/04/07   Page 70 of 74

## IX. RFC CONCERNING PLAINTIFF'S IMPAIRMENT IN MAINTAINING CONCENTRATION, PERSISTENCE, OR PACE

Plaintiff argues that the ALJ found that plaintiff had a moderate impairment in maintaining concentration, persistence, or pace; however, the ALJ failed to provide for any limitation in the residual functional capacity assessment that would take this limitation into consideration. To the contrary, the ALJ found that plaintiff was limited in her ability to understand and remember detailed instructions. This finding was made because of plaintiff's moderate impairment in maintaining concentration, persistence, or pace.

## X. PLAINTIFF'S ABILITY TO RETURN TO HER PAST RELEVANT WORK

Plaintiff argues that the ALJ failed to make specific findings as to the physical and mental requirements of plaintiff's past relevant work before finding that she could return to that work. Plaintiff's argument is without merit.

The ALJ specifically addressed both the physical and mental demands of plaintiff's several past jobs, including that of receptionist, and cited to data in the Dictionary of Occupational Titles as well as the Commissioner's regulations, that define the mental demands of work:

> Consideration must next be given to the question of whether the claimant retains the residual functional

71

> capacity to return to her past relevant work. The
> claimant's employment history includes work as an
> administrative assistant, bookkeeper, and receptionist.
> According to the Dictionary of Occupational Titles, the
> occupation of administrative assistant is skilled work,
> which is performed at the sedentary exertional level.
> The DOT numerical designation is as follows:  169.167-
> 010.  Likewise, the occupation of bookkeeper is skilled
> work performed at the sedentary exertional level (DOT #
> 210.382-014).  As defined in the Regulations, skilled
> work requires a level of complexity that is outside of
> the claimant's residual functional capacity (20 C.F.R.
> § 404.1568C). . .  The occupation of receptionist,
> however, is semi-skilled work performed at the
> sedentary exertional capacity.  Based on the evidence,
> I find that the claimant's residual functional capacity
> for a range of sedentary work would permit her to
> perform her past relevant work as a receptionist.

(Tr. at 22).

At step four of the sequential analysis, the ALJ must

determine the claimant's residual functional capacity and

make explicit findings regarding the actual physical and

mental demands of the claimant's past work.  Pfitzner v.

Apfel, 169 F.3d 566, 569 (8th Cir. 1999).  "The ALJ may

discharge this duty by referring to the specific job

descriptions in the Dictionary of Occupational Titles that

are associated with the claimant's past work."  Id.

In her administrative forms, plaintiff described her

job as a receptionist:  she sat for six hours, walked for

one hour, stood for 30 minutes, and her duties were

answering the phones, greeting guests, distributing mail,

Case 4:05-cv-01163-REL   Document 12   Filed 01/04/07   Page 72 of 74

doing billing, maintaining spreadsheets, and doing payroll (Tr. at 72). The heaviest weight she ever lifted was 20 pounds, and she frequently lifted ten pounds. Clearly, plaintiff is capable of performing the job of receptionist as she previously performed it with the RFC as found by the ALJ. The physical demands are within the physical RFC. The mental demands are within the findings of the mental health professionals who examined plaintiff. Dr. Caffrey found that plaintiff was a "good candidate for returning to employment settings where she can take full advantage of her transferrable skills. New or complex job settings that are unfamiliar to her, however, will expose her impairments." Therefore, Dr. Caffrey, who performed the most detailed mental tests of plaintiff, believed she was capable of performing a job she was familiar with.

Dr. Morrison, relying on plaintiff's scores on the WMS-III and Trail Making Tests, found that plaintiff would be capable of performing her previous jobs of secretary and receptionist.

Dr. Pulcher found that plaintiff's memory loss was not profound, that plaintiff's results on the WMS-III would indicate that she could handle employment where she is familiar with the work. "Her work experience as a secretary

and receptionist should be within her ability to function as shown on the WMS-III and Trail Making Tests."

The demands of the job of receptionist were considered by the ALJ in his reference to the Dictionary of Occupational Titles, and plaintiff's description of her duties as a receptionist in her administrative forms are consistent with her RFC both physically and mentally.

I find that the evidence supports the ALJ's determination that plaintiff can return to her past relevant work as a receptionist. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## XI.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's determination at step four that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 4, 2007

74